UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

DAVID LEON LASHLEY,

      Petitioner,

v.                                                    Case No. 1:20cv248-MW-HTC

SECRETARY FLORIDA DEPARTMENT
 OF CORRECTIONS,

      Respondent.

_____/

## REPORT AND RECOMMENDATION

      Petitioner, David Leon Lashley, proceeding *pro se* and *in forma pauperis*, filed a petition under 28 U.S.C. § 2254, raising four grounds challenging his conviction in the circuit court of Alachua County, Florida, for traveling to meet a minor for sexual activity after online solicitation.  ECF Doc. 1.  After considering the petition, the record, the state's response, ECF Doc. 13, and Petitioner's reply, ECF Doc. 15, the undersigned recommends the petition be DENIED without an evidentiary hearing.

## I.  BACKGROUND

### A.  The Offense and Conviction

      As described more fully below, the evidence at trial established that Petitioner traveled from Lake City to Gainesville, Florida, to have sex with who he thought was a ten-year-old girl after using email and a cellphone to solicit a woman he

thought was her mother (but who was actually a special agent of the Citrus County Sheriff's Office) to arrange for him to have sex with the girl.

At 7:45 p.m. on February 1, 2012, law enforcement in Alachua County, Florida placed an ad in the Lake City "casual encounters" section of the personals section of Craigslist as part of Operation Tailfeather, an undercover operation in which law enforcement target individuals who use the Internet to solicit and entice juveniles to commit sex acts. ECF Doc. 13-2 at 204 & 361. The ad, which was posted with the title "Looking for a man to help in the family fun area - w4m - 37 (High Springs area)", contained the following text: "Hey! I'm looking for a gentle and patient man that likes to teach in the 'family fun' area. I am a single mother with a yung one and need help. Serious replies only…" *Id.* at 204. At 9:06 p.m., Petitioner responded, "how ar u doing seeing if your [still] looking." *Id.* at 205. This began a three-hour series of emails (all of which are set out below) and led to two cellphone calls, which are also discussed below.

At 9:12 p.m., Special Agent Dodi Pruitt responded using email address shellibellee@gmail.com, "Hi! I am still looking. Are you discreet and patient? I ask because I'm looking for someone to teach my daughter about family fun." *Id.* at 205.

At 9:14 p.m., Petitioner responded, "I am 38 clean and fixed no more babbys fore me lol yes I code help." *Id.* at 206.

At 9:20 p.m., Petitioner sent a picture of himself and wrote, "pic of me what are u did u have i[n] mind". *Id.*

At 9:22 p.m., S.A. Pruitt responded, "Great! Is age a deal breaker for you? She is yung but at the age she wants to learn. She is almost 11." *Id.* at 207.

At 9:27 p.m., Petitioner responded, "as long as your ther . . . . I gess I code help . . . . As long as I dint go to jail ……….. My girlfriend ask me to help with her little girl but she was 15 and u have to be slow and take your time"

A minute later, he sent his phone number, stating "I am david 386-288-****"

At 9:36 p.m., S.A. Pruitt responded, "Hi David! I am Shelli. So you have experience in this area? 15 is older than my daughter but only a couple of years. What did you do with the 15 yo? I want to see if it is what I'm looking for. My daughter's name is Jess and she said you look like a hunter type and she likes that."

At 9:40 p.m., Petitioner responded, "well I showed her how to play with her slef where her g spot was and showed her how a man eats pussy and then we hade sex I walked her thru everything really slow." At 9:41 p.m., Petitioner added, "yes I like to hunt and fish play on the river".

At 9:43 p.m., S.A. Pruitt responded, "That sounds good. Is that something you would be willing to teach Jess? I am so very glad you replied to my ad because I was looking for an experienced man in this area. Being with a 10yo isn't something just anyone can do."

At 9:46 p.m., Petitioner responded, "well u have to take your time and be slow and be gentel ……. Do yall have a pic ….. Wen would yall like this to happen" At 9:54 p.m., Petitioner added, "whats so funny I never get on this sight .…. lol".

At 9:55 p.m., S.A. Pruitt stated, "I have a pic I can send you. What are you doing tonight? Where are you located? Jess usually stays up late. If not tonight when were you thinking?"

At 9:56 p.m., Petitioner responded, "I am free to night I am singel". At 9:57 p.m., Petitioner added, "I live in lake city where do yall live at".

At 10:02 p.m., S.A. Pruitt responded, "Cool! We live just outside of High Springs in Gainesville. I just told Jess you might come visit and she smiled. What would you be willing to teach her tonight? And if it works out would you be willing to come see her every once in a while to teach her more?"

At 10:03 p.m., Petitioner responded, "cool call me" and again gave his number. At 10:05 p.m., Petitioner added, "I would like a pic u can send to my phone."

At 10:11 p.m., S.A. Pruitt sent Petitioner a picture of another officer in the task force taken when that other officer was 10 years old. S.A. Pruitt stated, "Here is Jess. We'll call you in a minute." ECF Doc. 13-2 at 214, 222 & 373.

At 10:11 p.m., Petitioner asked, "what do u want her to know I don't want to scar her"

At 10:15 p.m., S.A. Pruitt responded, "I'd like you to start off slow with her and ease into things. How did you start with the 15yo?"

At 10:18 p.m., Petitioner responded, "I just took my time me and her mom was kissing and she kissed with us I star[t]ed tucking really slow and did to her mom first then her."

At 10:23 p.m., S.A. Pruitt responded, "started sucking really slow? Is that what you mean?"

At 10:26 p.m., Petitioner stated, "every thing has got to be gentel and slow u have to take your time ….. Do u have any toys ?????? dildo"

At 10:30 p.m., S.A. Pruitt responded, "I don't have one but if you do then maybe you can show her it and how to use one.  How would you want to start with her?  And what would you like to cover with her tonight?"

At 10:34 p.m., Petitioner responded, "a little kissing kiss her all over lick on her … I'll bring a toy and show her how to us[e] it and see what she likes ask if she like to tuch and look at . . . Let her lick my dick but thats up to her let her tuch it the mane thing find out what she likes".  At 10:35 p.m., Petitioner added, "fore play is very impornt".

At 10:39 p.m., S.A. Pruitt responded, "Okay, I think that's a good start.  Do you want us to call you?"

At 10:41 p.m., Petitioner responded, "yes call me I cant tipe work a carp lol"

At 10:42 p.m., Petitioner asked S.A. Pruitt, "what do u look like shelli singel married???"

At 10:43 p.m., S.A. Pruitt wrote, "I agree.  What did you have in mind? I like to discuss it with her so she is prepared."

S.A. Pruitt testified that she attempted to call the number he had given her and got no answer, ECF Doc. 13-2 at 380, so at 10:56 p.m., S.A. Pruitt wrote, "call me" and gave Petitioner a number.  At 11:20 p.m., Petitioner called the number and S.A. Pruitt answered, posing as Shelly; the call was recorded and played during the trial. ECF Doc. 13-2 at 383.

During the call, Petitioner shared how he was experienced in the area of introducing underaged girls to sex by recounting how he had previously had sex with two underage girls.  *Id.* at 387-90.  He then spoke with who he thought was 10-year-old Jess (it was actually another law enforcement officer with a high-pitched, young-sounding voice).  *Id.* at 391.  After making small talk and promising to take her mud bogging that weekend, he asked her, "Well, would you like for me to come over and meet y'all?"  After she said "Yeah", he asked her if she had any questions she wanted to ask, but she said, "I don't know."  When S.A. Pruitt came back on the line, Petitioner asked, "Is she interested in me coming over?" and S.A. Pruitt said "Yes" and "She says you're -- you know, she wanted to see you.  She's smiling now, so it must have been a good call."  *Id.*

After Petitioner reiterated in the call that he "had to be gentle", he told S.A. Pruitt that one had to "take your time and not rush into anything" when attempting to have sex with a ten-year-old. *Id.* at 393. He then asked if he should bring his dog, and S.A. Pruitt answered that Jess would like that, it would be a "good ice-breaker." *Id.* at 393-94. Petitioner told S.A. Pruitt that he was already in the truck heading over to Gainesville when S.A. Pruitt stated, "I want to get Jess ready. How long of a drive is it? I only need about 15 minutes or so to get her ready. I want to get her in the shower. Make sure she's nice and clean." *Id.* at 394-95.

Later, Petitioner called again from a gas station in Gainesville and asked for further directions. On the phone, S.A. Pruitt guided Petitioner directly into the driveway, where he parked and told her he was coming to the door. *Id.* at 395-401. When he got to the door and knocked, he was answered by a SWAT team which arrested him. *Id.* at 426. He had his dog with him, and his zipper was down. *Id.*

Petitioner was interviewed at the scene by Detective Scott Meffen, who testified at trial. Meffen testified that Petitioner admitted he had authored the emails and participated in the calls described above. *Id.* at 436. He also told Meffen "the best way to introduce Jess to sex would be to use a sex toy or dildo while talking with her" and "one of the best ways to show how to use a sex toy would be to show her while watching pornographic videos with her." He also admitted to Meffen that he enjoys reading about child and adult sexual encounters and had read over 100

such stories on the Internet. *Id.* at 437-38. When asked by Meffen if he would have had sex with Jess if the opportunity arose, Petitioner said that if the opportunity was presented to him, he possibly would have acted on that. *Id.* at 438. Notably, Meffen did not testify that Petitioner told him that Petitioner came to the house only in an attempt to dissuade the mother from offering her daughter for sex, a story he later pressed at trial.

Eventually, Petitioner was arrested and charged in a second amended information with four counts: Count I - using a computer to solicit a person he believed to be a child or that child's parent to engage in sexual activity; Count II - using a cellphone to facilitate that offense; Count III - traveling after using a computer as alleged in Count I; and Count IV - attempted sexual battery of a child 12 or younger. ECF Doc. 13-1 at 106-07. He picked up a fifth count for failure to appear when, while out on bond, he faked his death in a boating incident off Cedar Key and then absconded to Wyoming. *Id.*

Petitioner's first trial ended in a hung jury on July 23, 2014. ECF Doc. 13-1 at 203. On October 23-24, 2014, Petitioner was retried on Counts I through III and V (the State had *nolle prossed* the attempted sexual battery charge in Count IV) and was found guilty on all four counts. *Id.* at 278. He was sentenced to 15 years on the traveling count, 5 years consecutively on the online solicitation count, 5 years consecutively on the failure to appear count, and 5 years concurrently to all the rest on the using-a-cellphone count, for a total sentence of 25 years. *Id.* at 287. On direct

appeal (in which he did not challenge the failure-to-appear count), the First District Court of Appeals ("First DCA") affirmed the conviction for traveling to meet a minor (Count III) but reversed on the online solicitation count (Count I) and use of a cellphone count (Count II), finding they constituted double jeopardy with the charge in Count III. *Lashley v. State*, 194 So. 3d 1084 (Fla. Dist. Ct. App. 2016). The trial court resentenced Petitioner on just the traveling count and the failure-to-appear count on August 19, 2016, sentencing Petitioner to 15 years on the traveling count and 5 years, consecutively, on the failure-to-appear count, for a total sentence of 20 years. *Id.* at 779.

### B.    Post-Conviction History and Timeliness

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a petition for habeas relief must be filed within one year of certain trigger dates – the pertinent one here being one year from final judgment. 28 U.S.C. § 2244(d)(1)(A). Properly filed post-conviction motions, such as a motion under Florida Rule of Criminal Procedure 3.850, will toll the limitations period until the motion is fully resolved. *Id.* at § 2244(d)(2). As discussed below, the petition is timely filed.

Petitioner filed a direct appeal of his amended judgment and resentencing, and, on March 23, 2017, the First DCA affirmed *per curiam* without a written opinion. ECF Doc. 13-1 at 831. Therefore, the conviction became final ninety (90) days later, on June 21, 2017. *Lowe v. Fla. Dep't of Corr.*, 679 F. App'x 756, 757–58 (11th Cir. 2017) ("Under the Supreme Court's rules, the 90-day period for filing

a petition for certiorari begins to run from the date of entry of the judgment; and in the event a timely petition for rehearing is filed and denied, the period begins to run from the date of the denial. Sup. Ct. R. 13.3."). The AEDPA one-year time limit would have begun to run the next day, except that on May 20, 2017, Petitioner filed a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850 ("Rule 3.850 motion") which tolled the time limit until the First DCA issued its mandate on September 4, 2018. ECF Doc. 13-2 at 901-12 through 13-3 at 17; *Lashley v. State (1D18-33)*, 251 So. 3d 77 (Fla. 1st DCA 2018).

Also, as described in the Secretary's Response on pages six through ten, the Petitioner then filed a slew of overlapping applications for postconviction relief between August 17, 2018, and July 29, 2020, such that no time ran off of the AEDPA clock until September 4, 2020 (the day after the Florida Supreme Court dismissed SC20-1120). *See* ECF Doc. 13 at 6-10. Although several of the applications were rejected on procedural grounds, they still are considered "properly filed" and thus tolled the AEDPA time limit, so long as they were timely filed. *Artuz v. Bennett*, 531 U.S. 4, 9 (2000) ("the question whether an application has been 'properly filed' is quite separate from the question whether the claims *contained in the application* are meritorious and free of procedural bar."). Here, although some of Petitioner's applications were rejected by State courts as untimely filed, a review of the postconviction applications for relief filed by Petitioner reveals that there was always at least one application that was *not* rejected as untimely pending during all

of time from the finality date of the judgment until September of 2020. Petitioner

filed the federal habeas petition on October 14, 2020, well less than a year later, so

it is timely.

## II.    LEGAL STANDARDS

The AEDPA governs a state prisoner's petition for habeas corpus relief. 28

U.S.C. § 2254. Under the AEDPA, relief may only be granted on a claim adjudicated

on the merits in state court if the adjudication:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State
> court proceeding.

28 U.S.C. § 2254(d). This standard is both mandatory and difficult to meet. *White

v. Woodall*, 572 U.S. 415, 419 (2014).

"Clearly established federal law" consists of the governing legal principles set

forth in the decisions of the United States Supreme Court when the state court issued

its decision. *Id.* A decision is "contrary to" clearly established federal law if the

state court either: (1) applied a rule that contradicts the governing law set forth by

Supreme Court case law; or (2) reached a different result from the Supreme Court

when faced with materially indistinguishable facts. *Ward v. Hall*, 592 F.3d 1144,

1155 (11th Cir. 2010); *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).

A state court decision involves an "unreasonable application" of Supreme Court precedent if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005); *Bottoson v. Moore*, 234 F.3d 526, 531 (11th Cir. 2000), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Bottoson*, 234 F.3d at 531 (quoting *Williams*, 529 U.S. at 406). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

## III. DISCUSSION

### A. Ground One: Fundamental Miscarriage of Justice Because Second Amended Information Failed to Cite Specific Subsection of Statue and Omitted Essential Element of Crime Charged

In Ground One, Petitioner argues that a miscarriage of justice occurred in his case because the offense described in Count III of the Second Amended Information did not match the evidence adduced or the offense described in the Jury Instructions. ECF Doc. 1 at 9-11. Specifically, he alleges that he was charged with violating Fla. Stat. § 847.0135(4)(a), making it illegal to travel to meet a minor for unlawful sexual activity after soliciting or attempting to solicit a person believed to be a child, but convicted of violating Fla. Stat. § 847.0135(4)(b), making it illegal to travel to meet

a minor for unlawful sexual activity after soliciting or attempting to solicit another person believed to be a parent, legal guardian, or custodian of a child. Petitioner exhausted this ground by raising it in his direct appeal. ECF Doc. 13-2 at 652.

Under both Florida and federal law, a charging document that lists the wrong statutory section will not deprive the Petitioner of due process unless it deprives him of fair notice of the charges against him and prevents him from adequately preparing a defense. To provide fair notice the charging document should identify the elements of the offense charged and apprise the defendant of what he must be prepared to meet. *Russell v. United States*, 369 U.S. 749, 763–764 (1962) (collecting cases) (internal quotations omitted); *see also State v. Dilworth*, 397 So. 2d 292, 294 (Fla. 1981).

In this case, Petitioner received adequate notice of the charges against him and was able to adequately prepare a defense. First, the charging document explained the nature of the offense adequately, including a description that the solicitation involved the parent. ECF Doc. 13-1 at 106. Although the information referenced subsection "(4)(a)" instead of just "(4)" or "(4)(a) or (b)", Petitioner was nonetheless on notice that he could be found guilty of Count III if the jury found he solicited a parent instead of the child directly. Therefore, the incorrect statutory citation "is of no consequence". *Wood v. State*, 354 So. 2d 134, 135 (Fla. 1st DCA 1978) ("The information alleged a violation contrary to Section 843.15(1)(b) when it should have alleged Section 843.15(1)(a). This is of no consequence however.");

*see also Rolle v. Dep't of Corr.*, No. 4:17CV316/WS/EMT, 2019 WL 1370461, at *8 (N.D. Fla. Jan. 18, 2019), *adopted sub nom. Rolle v. Sec'y, Fla. Dep't of Corr.*, No. 4:17CV316-WS/EMT, 2019 WL 1369940 (N.D. Fla. Mar. 26, 2019), *aff'd sub nom. Rolle v. Dep't of Corr.*, 809 F. App'x 770 (11th Cir. 2020) (no due process violation found "[e]ven though the conduct alleged in the charging document qualified as a second degree felony [and] the charging document cited the statutory provision for a third degree felony"). Moreover, since Petitioner's first trial ended in a hung jury and Petitioner's conviction comes after a second trial, Petitioner can hardly be without notice of the charges against him when he sat through an entire trial where the State asserted the exact same theory of the case.

Additionally, the evidence presented at trial was sufficient to support a finding by the jury that Petitioner was guilty of subsection (4)(a). As discussed above, Petitioner not only communicated with "Jess" directly, but the State also presented evidence that "Shelly" was an intermediary to seduce "Jess". As Respondent points out, in *State v. Wilson*, 128 So. 3d 946 (Fla. 5th DCA 2013), the Fifth District Court of Appeals specifically rejected the argument that a defendant cannot be convicted of violating subsection (4)(a) unless there was a direct communication between the defendant and the child. *Id.* at 947. Instead, in reversing the lower court's dismissal of defendant's case, the appellate court found it sufficient that there was evidence defendant attempted to solicit the child through communications with a person he

believed to be the child's aunt.  *Id.*  Petitioner is not entitled to habeas relief on Ground One.

**B.     Ground Two: Miscarriage of Justice by Misleading Jury Instructions**

In Ground Two, Petitioner alleges he was charged only under subsection (4)(a), but that the jury instructions at his trial combined the standard jury instructions for both subsections (4)(a) and (4)(b).  ECF Doc. 1 at 13-15.  Petitioner alleges the State proved only that he communicated with "Shelly" posing as the child's mother, which was not a crime, and that fundamental error occurred when the State was permitted to instruct the jury on the uncharged subsection (4)(b).  Petitioner alleges he did not ask "Jess" to engage in a sexual act resulting in a violation of § 847.0135(4)(a) and no unlawful sexual conduct with "Jess" was proven.

As an initial matter, this claim is procedurally barred because Petitioner did not exhaust this claim.   A state prisoner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *Pruitt v. Jones*, 348 F.3d 1355, 1358-59 (11th Cir. 2003).  To provide such opportunity to the state court, a petitioner must make the state court aware of both the legal and factual bases for his claim. *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) ("Exhaustion of state remedies requires that the state prisoner 'fairly presen[t] federal claims to the state

courts in order to give the State the opportunity to pass on and correct alleged violations of its prisoners' federal rights.'") (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)).

Here, although Petitioner raised a similar issue in his direct appeal, Petitioner only challenged the instruction on Count I, involving Fla. Stat. § 847.0135(3), online solicitation of a minor for sex, rather than Count III, which involved § 847.0135(4), traveling to meet a minor after online solicitation. Nowhere in his appeal brief does Petitioner contest the jury instruction given for Count III. The fact that Plaintiff argued in his post-conviction motions that counsel was ineffective for not raising this issue also does not save the day because the two claims are "separate and distinct". *See, e.g., Pietri v. Fla. Dep't of Corr.*, 641 F.3d 1276, 1289 (11th Cir. 2011) (holding that a substantial judicial bias claim is "separate and distinct" from an ineffective assistance for purposes of the federal habeas exhaustion requirement). Therefore, Petitioner has not exhausted this claim.

Moreover, even if Petitioner had exhausted this claim, Petitioner is not entitled to relief on the merits. Because claims of error in state jury instructions are generally a matter of state law, they do not invoke a constitutional question. *Gilmore v. Taylor*, 508 U.S. 333, 342-343 (1993); *Jacobs v. Singletary*, 952 F.2d 1282, 1290 (11th Cir. 1992). Thus, "[w]here the claim is merely that a jury instruction was incorrect under state law, federal habeas relief is not available." *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). Instead, to warrant habeas relief, Plaintiff must show the jury

instructions rendered his trial fundamentally unfair – which he has not done. *See Erickson v. Sec'y for Dept. of Corr.*, 243 F. App'x 524, 528 (11th Cir. 2007).

The jury instruction given was an amalgamation of the two standard instructions for communicating with the child directly and communicating with the parent directly. ECF Doc. 13-1 at 265. The instructions provided fairly and correctly stated the issues and the law. *See United States v.* Russell, 717 F.2d 518, 521 (11th Cir. 1983). Moreover, as discussed in Ground One, the State presented evidence sufficient to convict Petitioner on both subsections 4(a) and 4(b). Thus, the jury instruction did not render the trial fundamentally unfair, and Petitioner is not entitled to habeas relief on Ground Two.

### C.   Ground Three: "Manifest Constitutional Error" by the Trial Court That Had an Identifiably Negative Impact on the Jury Trial

In Ground Three, Petitioner raises the same argument he made in Ground One – that is, he alleges the state charged him with violating subsection (4)(a), but only proved subsection (4)(b) and that he was not put on notice they would be attempting to obtain a conviction under (4)(b). For the reasons set forth in Ground One, Petitioner is not entitled to relief.

### D.   Ground Four: Ineffective Assistance of Trial Counsel ("IATC")

In Ground Four, Petitioner alleges his counsel was ineffective. The entirety of Petitioner's claim is as follows:

> Trial Counsel was Ineffective, Where Actual Conflict of Interest Adversely Affecting Attorney. The ineffective assistance of counsel deprive Mr.

Lashley of the right to effective assistance of counsel. Lawyer's poor performance due to conflict on the face of the record + where there is a mixed question of law." ECF Doc. 1 at 21.

An IATC claim requires a showing that (1) counsel's performance during representation fell below an objective standard of reasonableness, and (2) prejudice resulted, *i.e.*, that a reasonable probability exists that but for counsel's unprofessional conduct, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 689 (1984). The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential. *Id.* at 689. The Petitioner bears the burden of proving counsel's performance was unreasonable under prevailing professional norms and the challenged action was not sound strategy. *Id.* at 688-89.

*Strickland*'s prejudice prong requires a petitioner to allege more than simply that counsel's conduct might have had "some conceivable effect on the outcome of the proceeding." 466 U.S. at 693. Petitioner must show a reasonable probability exists that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Bare allegations the Petitioner was prejudiced by counsel's performance are not enough. *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987).

Here, Petitioner is not entitled to habeas relief because his allegations are conclusory. Petitioner does not state how counsel's performance was defective or

how counsel's conduct prejudiced him. "Rule 2(c) of the Rules Governing Section 2254 Cases requires petitioners to 'specify all the grounds for relief available to the petitioner' and 'state the facts supporting each ground.'" *Hittson v. GDCP Warden*, 759 F.3d 1210, 1265 n.62 (11th Cir. 2014). Generalized and conclusory allegations are simply not enough to warrant a hearing, much less any habeas relief. *See id.*; *Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011).

Petitioner also does not identify the alleged conflict in his federal petition. However, in his state court applications for postconviction relief, Petitioner alleged counsel was under a conflict because Petitioner had refused to pay him and because counsel was having difficulty budgeting the time for trial preparation because of a new appointment. ECF Doc. 13-3 at 23; *see also* Petitioner's Reply, ECF Doc. 15 at 3. The state court rejected this claim, explaining that Petitioner must demonstrate an actual conflict of interest that adversely affected his lawyer's performance but had not made such a showing. *Id.* This conclusion was not contrary to, and did not involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d).

A possible, speculative or merely hypothetical conflict "is insufficient to impugn a criminal conviction." *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980) ("[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance."). A review of the record, including numerous pretrial

motions and a vigorous defense at trial and retrial, shows that counsel zealously represented Petitioner and did not hold back because of any putative conflict. Also, the evidence against Petitioner – his emails, telephone calls, actions, and post-arrest statements – was strong such that there was no likelihood of a different outcome had counsel acted differently. Therefore, Petitioner is not entitled to habeas relief on Ground Four.

## IV. CONCLUSION

### A. Evidentiary Hearing

The undersigned finds that an evidentiary hearing is not warranted. In deciding whether to grant an evidentiary hearing, this Court must consider "whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). Additionally, this Court must take into account the deferential standards prescribed by § 2254. *See id.* Upon consideration, the undersigned finds that the claims in this case can be resolved without an evidentiary hearing. *See Schriro*, 550 U.S. at 574.

### B. Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Court provides: "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing

required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

After review of the record, the Court finds no substantial showing of the denial of a constitutional right. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, it is also recommended that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "[B]efore entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Rule 11(a), Rules Governing 2254 Cases. If there is an objection to this recommendation by either party, that party may bring such argument to the attention of the district judge in the objections permitted to this Report and Recommendation.

Accordingly, it is respectfully RECOMMENDED:

1.    That the petition under 28 U.S.C. § 2254, challenging the conviction in *State v. Lashley*, 2012 CF 874, in the Eighth Judicial District, in and for Alachua County, Florida, ECF Doc. 1, be DENIED without an evidentiary hearing.

2.    That a certificate of appealability be DENIED.

3.    That the clerk be directed to close the file.

DONE at Pensacola, Florida, this 23rd day of January, 2023.

*/s/ Hope Thai Cannon*

**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

<u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations must be filed **within fourteen (14) days** of the date of the Report and Recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u> An objecting party must serve a copy of its objections upon all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.